Send

FILED
CLERK, U.S. DISTRICT COURT
DEC - 8 2004
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| FW OMNIMEDIA CORP., a Canadian corporation; and FW OMNIMEDIA USA INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>TOYOTA MOTOR SALES, U.S.A., INC., a California corporation,<br><br>Defendant. | Case No. 04-8624 GPS (JRx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: APPLICATION FOR PRELIMINARY INJUNCTION** |

DOCKETED ON CM
DEC - 9 2004
BY 014

Plaintiffs having applied for a preliminary injunction, and defendant having opposed the application, and the matter having come on for hearing on November 15, 2004, and the Court having duly considered the parties' papers and oral arguments, and the Court having determined to **DENY** the Application for Preliminary Injunction, the Court hereby makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

## THE PARTIES AND PROCEDURAL HISTORY

1. Plaintiffs are FW OmniMedia USA Inc., a U.S. corporation with its principal place of business in Santa Monica, California, and FW OmniMedia Corp., a Canadian corporation with its principal place of business in Toronto, Ontario, Canada. Plaintiffs are in the marketing business.

26

Their products and services include promotional events, direct e-mail newsletters, an online network, and a magazine. (Compl. ¶ 5; *see also* Decl. of Jonathan Bogo in Supp. of Application of Pls. for a T.R.O. and Order to Show Cause re Prelim. Inj. ("Bogo Decl.") ¶¶ 2,3.)

2. On October 18, 2004, Plaintiffs FW OmniMedia USA Inc. and FW OmniMedia Corp. (collectively, "FW") filed a Complaint against Toyota Motor Sales, U.S.A., Inc. alleging causes of action for: (1) federal unfair competition; (2) California unfair competition; (3) intentional interference with prospective economic advantage; and (4) declaratory relief. (Compl.)

3. On October 18, 2004, FW also applied *ex parte* for an Order temporarily restraining TMS from using a mark which FW alleged to be confusingly similar to marks owned by FW, and for an Order that TMS show cause why a preliminary injunction should not issue granting the same relief. (Application of Pls. for a T.R.O. and Order to Show Cause re Prelim. Inj. ("App.") at 2.)

4. FW alleges that TMS' new marketing campaign employing the tag-line "moving forward ▸" constitutes infringement of FW's "FW forward>>" or "FW▸▸forward" trademarks. FW asserts that TMS' creation of its tag-line only arose after TMS placed its products at FW's promotional events. FW contends that TMS enjoyed great marketing success as a result of featuring its products at FW's events. FW asserts that TMS thereafter sought to capitalize on FW's strength in marketing to young adults by adopting a tag-line that is sufficiently similar to FW's trademark to confuse consumers. (App. at 2-3.)

5. On October 22, 2004, this Court issued an Order Denying Plaintiffs' Ex Parte Application for a Temporary Restraining Order and issued an Order to Show Cause re: Preliminary Injunction. The Court was unable to find, on the record before it at that time, that FW had met its burden of demonstrating that a likelihood of confusion existed and therefore the Court would not presume irreparable harm. (Order Denying Pls.' *Ex Parte* Application for a T.R.O. and issued an Order to Show Cause re: Prelim. Inj. ("TRO Order") at 7.) Neither had FW made an independent showing of such harm. (*Id.*)

6. The Court also concluded full briefing was appropriate, and ordered TMS to show cause why a preliminary injunction should not issue. (TRO Order at 1.) The Court therefore set a schedule for briefing and hearing on the Order to Show Cause. (T.R.O. Order at 8.)

7. The parties filed their respective briefing papers according to the schedule set by the Court in its TRO Order, and the hearing on the Order to Show Cause was held on November 15, 2004.

8. On November 16, 2004, the Court issued a Minute Order denying Plaintiff's application for a Preliminary Injunction, which Minute Order was docketed and served on November 18, 2004. The Minute Order instructed TMS to submit to the Court, and serve on FW, proposed findings of fact and conclusions of law no later than November 19, 2004. The Minute Order also permitted FW to file objections to the proposed findings of fact and conclusions of law no later than November 23, 2004.

**FW'S ALLEGED TRADEMARKS: "FW FORWARD>>" AND "FW▸▸FORWARD"**

9. FW claims two related trademarks: "FW forward>>" (Bogo Decl. 7, Ex. 1) and "FW▸▸forward" (Bogo Decl. ¶ 8, Ex. 2.).

10. Neither "FW▸▸forward" nor "FW forward>>" is registered with the United States Patent and Trademark Office.

**THE DIFFERENCES BETWEEN "FW▸▸FORWARD" AND "FW FORWARD>>"**

11. The alleged marks "FW▸▸forward" and "FW forward>>" are visually different from one another.

12. In the "FW▸▸forward" version of the alleged trademark, the characters depicted by "▸▸" appear as two solid red sideways triangles, with the point end of the first triangle touching into the base end of the second angle. "FW" is somewhat larger than "forward." All appear on the same line.

13. In the "FW forward >>" version of the alleged mark, as it appears on one issue of FW Magazine, the characters depicted by ">>" are not solid red sideways triangles, but instead appear as line marks similar in appearance to the lines as typed here but not as deeply angled. They are light-colored, possibly light yellow, and do not touch one another. In contrast to the "FW▸▸forward" iteration, in the "FW forward>>" iteration, "FW" is many times larger than "forward>>." The two are separated by about 3 1/4 inches, FW being flush with the left hand side of the magazine cover and "forward>>" being flush with the right hand side of the magazine cover.

**FW'S USE OF ITS ALLEGED "FW▸▸FORWARD" MARK**

14. The "FW▸▸forward" iteration of the alleged mark currently appears on FW's Website, www.myfw.com. FW alleges that it began using "FW▸▸forward" on its Website as early as April 2004 but has not proven that use date. FW submitted to the Court only the current version of its Website, indicating that it was printed on October 15, 2004. (Bogo Decl. ¶ 8, Ex. 2.)

15. The "FW▸▸forward" iteration of the alleged mark appears on the home page and registration pages of the www.myfw.com Website. (Supplemental Bogo Decl. ("Bogo Suppl. Decl.") ¶ 4; Funk Decl. ¶ 20, Ex. 17.) On the other pages of FW's Website, the "FW▸▸" component of the combination stays constant, but the word "forward" is replaced by other words as one goes from page to page. The following page headings are presented on the site: "FW▸▸About Us"; "FW▸▸Gaming"; "FW▸▸Gadgets"; "FW▸▸Music"; "FW▸▸Hollywood"; "FW▸▸Play"; "FW▸▸Fashion"; "FW▸▸Home"; "FW▸▸Body"; "FW▸▸Transit"; FW▸▸Work"; "FW▸▸Sex"; and "FW▸▸Privacy." (Funk Decl. Ex. 17.)

16. The e-mails sent out by FW are headed "FW Email." (Funk Decl. Ex. 16.) They do not contain the "▸▸forward" portion of the alleged mark.

17. When an e-mail subscriber receives an e-mail from FW, that e-mail contains direct links to the content pages at FW's Website, bypassing the home page and registration page. (Funk Decl. ¶ 20, Ex. 16.)

18. On numerous occasions on its Website, e-mails, and presentation materials, FW refers to itself and its magazine as "FW," not "FW▸▸forward." (Funk Decl. Exs. 16, 17; Decl. of Robyn Gorman in Supp. of Application of Pls for a T.R.O. and Order to Show Cause re Prelim. Inj. ("Gorman Decl.") Ex. 5; Decl. of Jerrold B. Reilly In Opp'n to Pls.' Application for Prelim. Inj. ("Reilly Decl.") ¶ 6, Ex. 9.)

19. Although at some point FW put "FW▸▸forward" on its Website home and registration pages, it is not used on the Website as a trademark.

**FW'S USE OF ITS ALLEGED "FW FORWARD>>" MARK**

20. The "FW forward>>" iteration of FW's alleged mark appears on the most recent issue of its magazine, the "Brad Pitt issue." (Bogo Decl. Ex. 1.) The Brad Pitt issue of FW Magazine indicates that it is the "Jul/Aug 04" issue. (*Id.*)

21. The Brad Pitt issue was not printed until mid-July 2004. On July 14, 2004, it was submitted as a mock-up to TMS. (Supplemental Decl. of Robyn Gorman ("Gorman Suppl. Decl.") ¶ 13; see also Funk Decl. ¶ 18.)

22. Before the Brad Pitt issue, FW Magazine did not include the word "forward" on the cover. (Funk Decl. ¶ 18, Exs. 12-14.)

23. FW Magazine is published by Freewheelin' Magazine, Inc., a division of FW Omnimedia Corp. (Funk Decl. ¶ 17, Ex. 11, 15; Reilly Decl. ¶ 2, Ex. 1.)

24. On its masthead, FW refers to itself as FW Magazine, not "FW forward>>" Magazine. (Funk Decl. Exs. 11, 15.)

25. The use of "FW forward>>" on the Brad Pitt issue is not a trademark use.

**THE TMS/FW SPONSORSHIP AGREEMENT**

26. Beginning in late Fall 2003, representatives of FW approached TMS' marketing department to persuade TMS to sponsor a series of events promoted by FW. (Gorman Decl. ¶ 4; Funk Decl. ¶ 3.)

27. Representatives of FW and TMS met several times in December 2003 and January 2004 to discuss details on the conduct and location of these events. (Gorman Decl. ¶¶ 6-8; 11, 13; Funk Decl. ¶ 7.)

28. Effective as of January 29, 2004, FW and TMS entered into a Sponsorship Agreement. Under the terms of the Sponsorship Agreement, in exchange for $895,000, FW agreed to organize, promote and oversee the presentation of Toyota/FW "Bring on the Sun" Events from April 17, 2004 through July 31, 2004 and VIP Toyota/FW Photo Experience Events from July 1, 2004 through September 30, 2004. (Gorman Decl. ¶ 11, Ex. 6; Funk Decl. ¶¶ 8, 9, Exs. 1, 2.)

**THE TOYOTA/FW EVENTS**

29. From April 15, 2004 until July 24, 2004, FW conducted "Bring on the Sun" events in the following states:

California:

| | |
|---|---|
| Santa Cruz Beach | June 12-13 |
| Santa Monica Pier | July 10 |

| | |
|---|---|
| Venice Beach | July 16 |
| Hermosa Beach | July 17 |
| Bolsa Chica Beach | July 18 |
| Mission Beach | July 24 |
| Washington State: | July 16, 17, 18 |
| Texas: | April 15-18; May 22-23, 29 |
| Florida: | May 29, 30; July 4 |
| New York/New Jersey: | July 3-4 |
| Georgia: | June 5; July 10 |
| Michigan: | July 3-6 |
| Washington D.C.: | June 26-27 |
| Massachusetts: | July 11 |
| Arizona: | May 30 |
| Illinois: | June 26 |
| Ohio: | July 24 |

(Bogo Decl. ¶ 10, Ex. 3; Funk Decl. ¶ 14, Ex. 9.)

30. None of the pictures of these events submitted either by FW or TMS show any sign, poster, hat, t-shirt, or other object (other than the Brad Pitt issue of the magazine) bearing the words "FW ▸▸ forward" or "FW forward >>."

31. FW's Brad Pitt issue, dated July/August 2004, had the picture of movie star, Brad Pitt, on the front cover with "FW" in large letters on the top left hand side and "forward>>" in much smaller letters in the upper right hand corner. (Bogo Decl. ¶ 7, Ex. 1; Funk Decl. ¶ 18, Ex. 15.)

32. The masthead for the July/August 2004 issue had "FW" in large letters at the top of the masthead and, in addition to the names of editors and other personnel, had the following:

<u>The Fine Print</u>

FW Magazine is published by Freewheelin' Magazine, Inc., a division of FW Omnimedia Corp., a Media & Entertainment Corporation.



SCANNED

(Funk Decl. ¶ 17, Ex. 15.)

33. The Brad Pitt issue of FW Magazine was available and could have been distributed at the Toyota/FW events that occurred after July 14, 2004. (Gorman Suppl. Decl. ¶ 13.) Only 25,000 copies of that issue were distributed. (Bogo Suppl. Decl. ¶ 5.)

34. FW did present evidence that the Brad Pitt issue of FW Magazine was displayed and distributed at certain events that took place after July 14, 2004, but did not establish that the Brad Pitt issue was displayed at each of the post-July 14 events. Nor did FW establish how many magazines were displayed or distributed at any one of these post July 14 events. The word "forward>>" on the Brad Pitt issue is not easily visible, and is not discernable on any of the photos depicting the events. (Gorman Suppl. Decl. Exs. 16-29. *See, e.g.*, Ex. 23.)

35. Toyota/FW Photo Experience events were held in Denver, San Francisco, Austin, San Diego, Seattle, Boston, Chicago, Miami, and New York City on September 22 and 23, 2004. (Bogo Decl. ¶ 11, Ex. 4.)

36. FW offered what appear to be four photographs of a Photo Experience Event, all apparently taken at the same place, showing people holding copies of FW Magazine. (Gorman Suppl. Decl. ¶ 21, Exs. 17, 19, 20, 28.) Only two photos show what is recognizable as a Brad Pitt issue of FW Magazine, and those two photos are of the same group of four people. (*Compare* Ex. 17, upper left hand corner, with Ex. 20.) FW did not, or could not, identify where the pictures were taken. There was no other evidence submitted establishing that copies of the Brad Pitt issue were distributed at any Photo Experience Event.

37. During the "Bring on the Sun" events, FW representatives approached attendees soliciting information and inviting them to subscribe to FW Magazine and sign up for FW's internet services and information. (Gorman Suppl. Decl. ¶ 15.)

38. Jonathan Bogo, an officer of each of plaintiff companies, presented a declaration that during the Toyota/FW events, representatives of FW held face-to-face conversations with 258,500 people who attended the events, and that of those interviewed, 82,704 signed up to receive FW Magazine and e-mail from FW. According to Mr. Bogo, 1,182,000 persons attended the Toyota/FW events. (Bogo Decl. ¶ 12.)

39. FW did not present any evidence as to any subscription income or prove that any magazine bearing the "FW forward>>" mark was ever sent to any of these subscribers. Instead, the 25,000 copies of the Brad Pitt edition of the FW magazine were distributed at the "Bring on the Sun" and "Photo Experience" events. (Bogo Suppl. Decl. ¶ 5.)

40. FW did not establish what magazine issue, if any, was shown to any interviewee or subscriber and did not put into the record any evidence indicating the basis on which subscribers signed up for FW Magazine or FW e-mail.

41. FW reported to TMS that in post-event surveys it conducted, 97% of the persons surveyed indicated they knew that Toyota sponsored the event they attended. (Gorman Decl. ¶ 18, Ex. 5.)

42. FW did not present any evidence as to the details of the survey or any data supporting the conclusion that 97% knew of Toyota's sponsorship.

**TOYOTA'S "MOVING FORWARD" TAG-LINE**

43. TMS' current advertising campaign includes the tag-line "moving forward ▸". (Gorman Decl. ¶ 17, Ex. 8.)

44. On September 28, FW learned that TMS was going to use "Moving Forward ▸" as a tag-line in its new advertising campaign. (Gorman Decl. ¶ 24.)

45. Before adopting the "moving forward ▸" tag-line, TMS used the tag-line "The power to move forward" for its Prius vehicle in 2003. ("Decl. of Keith St. Clair in Opp'n to Application of Pls. for an Order to Show Cause Re: Prelim. Inj. ("St. Clair Decl.") ¶ 2, Exs. 1-3.)

46. Toyota used the phrase "Toyota, Moving Forward with America," in connection with the dedication of an assembly plant in October, 1988. (Reilly Decl. ¶ 8, Ex. 12.)

47. TMS, in conjunction with Saatchi & Saatchi ("Saatchi"), developed the "moving forward ▸" tag-line. The development process began in November 2003. (St. Clair Decl. ¶ 3.)

48. TMS and Saatchi conducted numerous interviews and focus groups before settling on the "moving forward ▸" tag-line. (St. Clair Decl. ¶¶ 3-13.) TMS and Saatchi included the "moving forward" concept in the development process because the tag-line "The power to move forward" had been well-received. (St. Clair Decl. ¶ 5.)

49. At no time during the FW/TMS meetings did FW present any written material indicating that FW was using "forward" alone or in combination with either "FW" or FW▸▸ as a trademark. (Funk Decl. ¶ 17, Ex. 1,2; St. Clair Decl. ¶ 16, Ex. 4-6.)

50. When FW first met with TMS in December 2003, and through at least the Winter of 2003/2004, FW's name included the tag-line "The Art of Living." (Gorman Decl. ¶ 4; Funk Decl. ¶ 6, Ex. 1, 2, 12 (Johnny Depp issue, dated Winter 03/04); St. Clair Decl. ¶¶ 14-16, Exs. 4-6.)

51. Keith St. Clair, TMS' National Advertising Manager, only met with FW in January 2004. (St. Clair Decl. ¶ 14; Gorman Decl. ¶ 13; Gorman Supp. Decl. ¶ 4.) The FW materials received by Mr. St. Clair do not include the word "forward." (St. Clair Decl. ¶ 16, Exs. 4-6.) Mr. St. Clair worked with Saatchi to develop TMS' "moving forward ▸" tag-line. (St. Clair Decl. ¶¶ 3-13.)

52. Although evidence was presented that TMS received two reports, one in late May and the other sometime after promotional events occurred in mid-July, each of which contained one page with a depiction of a Website with "FW▸▸forward", no evidence suggested that the use of "FW▸▸forward" contained in these reports was a trademark use. (Funk Decl. ¶ 12, Ex. 6, at 4, Ex. 7 at 4.)

53. The parties disagree on whether FW called itself "forward" during the meetings between FW and TMS. The only evidence of the way "FW Magazine" was referred to audibly, a video of a Bring on the Sun event on July 11, 2004 (Funk Decl. ¶, 14, Ex. 10) demonstrates that FW Magazine was not called "forward."

54. TMS did not receive a mock-up of the Brad Pitt issue of FW Magazine until July 14, 2004. (Gorman Suppl. Decl. ¶ 13.)

55. By July 14, 2004, TMS already had formally decided on the "moving forward ▸" tag-line. (St. Clair Decl. ¶ 12.)

56. Robert Funk, who worked closely with FW on the TMS/FW events, was not aware of the tag-line until August 2004. (Funk Decl. 23.)

**LIKELIHOOD OF CONFUSION FACTORS**

57. Any commercial exposure of the alleged marks has been quite limited in both

temporal duration and volume. The commercial strength of the alleged "FW forward >>" and "FW▸▸forward" marks at this time is low.

58. FW provides a print magazine, online content service, and product-promotional services. TMS markets and sells Toyota automobiles and trucks. The goods and services of FW are therefore not related to the goods of TMS.

59. FW has not shown widespread public association between FW as an endorser and Toyota cars as the endorsed product. FW has not shown that U.S. consumers are aware of FW's sponsorship of Ford cars in Canada or its efforts to get sponsorship deals with other car companies in the United States.

60. TMS' "moving forward ▸" tag-line is always used in association with the Toyota mark, and always in association with automobiles. TMS's "moving forward" tag-line is sometimes used as part of a longer phrase. (Gorman Decl. Ex. 8 at 98) ("MOVING FORWARD IS 'a truck that works as hard as you do.'")

61. The alleged "FW forward >>" and "FW▸▸forward" marks are used in reference to a lifestyle magazine and website addressed to the youth market.

62. Given this context, the meaning of the respective marks is not close.

63. The marks in their entireties are not closely similar in sound. "Moving" does not sound at all like FW ("eff-double-you"), and the phrase "FW forward" has six syllables, compared to the four syllables which comprise "moving forward."

64. The marks are visually different. "Moving" and "FW" have different visual impacts. FW is the dominant portion of the "FW forward>>" and "FW▸▸forward" marks, being larger than "forward" in both cases (much larger in the case of "FW forward>>" and somewhat larger in the case of "FW▸▸forward"). In both cases, "FW" appears in capital letters and "forward" appears in lower case letters.

65. Although "FW forward>>", "FW▸▸forward", and "moving forward ▸" all use a forward pointing device, the devices used in all three are different from one another. (*See supra* at ¶¶ 11-13 for a comparison of "FW forward>>" and "FW▸▸forward.") The triangle used in "moving forward ▸" is a different shape and color than the triangles used in "FW▸▸ forward". Moreover, "FW

forward>>" and "FW▸▸forward" both use two forward pointing devices, while "moving forward ▸" only uses one.

66. The marks, as actually used in commerce, are not closely similar.

67. No evidence was presented that any person interested in buying a Toyota car and seeing the "moving forward ▸" Toyota advertisements believed either that FW had built the car or that FW was endorsing the car.

68. No evidence was presented showing that a reasonable consumer doing business with FW did so believing that FW was sponsored or affiliated with Toyota as a result of Toyota's use of the "moving forward ▸" tag line.

69. There is no evidence of actual confusion. FW offered evidence that three individuals inquired about the relationship between TMS and FW after viewing TMS' "moving forward ▸" campaign. Two of those individuals - Jordan Gertner and Matt Turner - were closely connected to the promotional events. Mr. Gertner was the producer of the Photo Experience events while Mr. Turner was a disc jockey for five of FW's Bring on the Sun events. In these roles, Mr. Turner and Mr. Gertner were predisposed to see the connection between the two entities because of their superior knowledge of the prior working relationship between the parties. Manifestly, they did not have the perspective of a typical consumer. While the third individual, Lucia Cottone, did not have a connection with the promotional activities, her email does not demonstrate actual confusion. Instead, she indicates that she believes TMS has taken liberties with FW's purported marks. (App. Exs. 11-13.)

70. There is no ongoing overlap in marketing channels. While both parties promote their products through websites, those websites do not have similar names (<u>www.toyota.com</u> versus <u>www.myfw.com</u>), and do not offer similar competing services. FW has offered no evidence that it advertises its services in the print and television media where TMS' advertisements are featured.

71. An automobile is a major purchase, and one in which a reasonably prudent purchaser would invest a great deal of care and attention, rendering confusion less likely. FW did not cite any evidence of the care a reasonably prudent purchaser would use in determining whether FW sponsored

Toyota vehicles, or whether Toyota sponsored FW. Neither has FW shown widespread public association between FW as an endorser and Toyota cars as the endorsed product.

72. FW has not shown that an inference of intent to deceive is warranted. TMS was in fact using "forward"-themed automotive advertising slogans before TMS had ever been contacted by FW. TMS adopted its "moving forward ▸" tag-line in good faith and independently of any use by FW of any mark containing the word "forward."

73. FW already has provided its promotional services in the automotive field, both to Ford in Canada and to TMS in the United States. As FW admits, "When we first began pursuing Toyota as a client, Ford expressed considerable concern." (Bogo Decl. ¶ 21; Gorman Decl. ¶ 27). If FW were to get other automotive promotional work, it would not be expanding into a new field. Hence, FW has not proved a likelihood of expansion.

**IRREPARABLE HARM**

74. FW has not offered any competent, convincing evidence that it will suffer any harm as a result of TMS' use of its "moving forward" tag-line.

**THE BALANCE OF HARDSHIPS TILTS STRONGLY IN FAVOR OF TMS, NOT FW**

75. Halting its advertising campaign featuring the "moving forward ▸" theme and tag-line would cost TMS on the order of $25 million. (St. Clair Decl, ¶¶ 17-21.) FW's assertion that TMS's cost would be "no more than $50,000" (Gorman Supp. Decl. ¶ 27), based upon its suggestion that TMS could simply "reuse its earlier television advertising" (Gorman Supp. Decl. ¶ 28) is not credible.

76. FW's Application initially was rejected because FW failed to comply with the requirements set forth in Fed. R. Civ. P. 65(b) for seeking a TRO without providing notice to TMS. (TRO Order, p. 2.)

**CONCLUSIONS OF LAW**

1. A party seeking preliminary injunctive relief must meet one of two tests: “either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions going to the merits were raised and the balance of hardships tips sharply in its favor.” *Immigrant Assistance Project of the Los Angeles County Fed'n of Labor v. Immigration and Naturalization Serv.*, 306 F.3d 842, 873 (9th Cir. 2002).

2. In a trademark infringement claim, these bifurcated tests are "somewhat misleading" because "irreparable injury may be presumed from a showing of likelihood of success on the merits." *GoTo.Com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.4 (quoting *Brookfield Communications, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1086 (9th Cir. 1999)). As such, "[t]his presumption effectively conflates the dual inquiries . . . into the single question of whether the plaintiff has shown a likelihood of success on the merits."

3. Where, as here, a plaintiff claims infringement of an unregistered word or symbol alleged to be a trademark, the plaintiff is not entitled to the presumptions that attend federal registration of a trademark. *SoftMan Prods. Co. v. Adobe Sys., Inc.*, 171 F. Supp. 2d 1075, 1091 (C.D. Cal. 2001), quoting *Vuitton et Fils S.A. v. J. Young Enterprises, Inc.*, 644 F.2d 769, 775 (9th Cir. 1981).

4. A prerequisite for the establishment of common law trademark rights is that the plaintiff must have made commercial use of the alleged mark that is "sufficiently public" that the marked goods are "identified or distinguish[ed]...in an appropriate segment of the public mind as those of [the adopter of the mark]." *Glow Industries v. Lopez, et al.*, 252 F. Supp. 2d 962, 981 (C.D. Cal. 2002).

5. Here FW's evidence offered to show such use of "FW forward >>" suffers from deficiencies including the following: (A) The alleged mark "FW forward >>" for FW's magazine has never actually been affixed to a magazine cover in the form alleged; instead, the "Brad Pitt" issue displays the element "FW" in the upper left corner of the cover, with "forward >>" in the upper right corner, separated by several inches; and FW offers no evidence that the public even perceives "FW forward >>" as a combination, to say nothing of recognizing it as a trademark; (B) from the manner of placement it would seem, absent evidence to the contrary, that observers most likely would understand "FW" to be the name and mark of the magazine but would understand "forward >>" simply as an instruction to turn the page, not as part of the name or mark of the magazine; (C) evidence that persons were told orally that "FW" means "forward" would, even if credited, fail as a matter of law to constitute use of "FW forward >>" as a trademark; (D) evidence that the magazine's name was pronounced "forward" would, even if credited, fail as a matter of law to establish use of

"FW forward >>" as a trademark. The court concludes that FW has not proven trademark use of "FW forward >>".

6. FW's evidence offered to show trademark use of "FW▸▸forward" is legally insufficient for similar reasons, including the following: Although the combination "FW▸▸ forward" does appear at the top of the introductory pages of FW's website, that form does not appear consistently. Instead, "FW▸▸" always appears, but usually with some other word, not "forward," in juxtaposition. FW offers no evidence that the public perceives or understands "FW▸▸forward" to be the name or mark of the Website or of the content-providing service offered via the Website; and absent such evidence, the likeliest inference is that the public understands "FW" or "FW▸▸" to be the mark and "forward" to be merely a descriptor of the contents of the pages on which it appears. Hence, the court concludes that FW has not proven trademark use of "FW▸▸forward."

7. In order to establish likelihood of success on the merits, a movant for preliminary injunction based on an alleged unregistered mark must demonstrate the territorial scope of its trademark use. *Glow Industries, supra*, 252 F. Supp. 2d at 983.

8. Generally, the senior user of an unregistered mark is entitled to assert trademark rights in all areas in which it has used the mark as a trademark and has "legally sufficient market penetration." Sufficiency of market penetration is assessed by "examining the trademark user's volume of sales and growth trends, the number of persons buying the trademark product in relation to the number of potential purchasers, and the amount of advertising . . . . Market share may also be used to assess whether penetration is legally significant." *Glow Industries, supra*, 252 F. Supp. 2d at 983 [citations omitted].

9. Although FW has offered evidence of publicity and distribution of the "Brad Pitt" issue of its magazine, including evidence that it achieved certain numbers of "sign-ups," in certain specified states, by persons indicating that they wished to subscribe to FW's magazine, the court concludes that FW's evidence of market penetration is legally insufficient because of deficiencies including but not limited to the following: (A) It is vague, indefinite and uncertain as to how many persons, and in what localities, actually "signed up" after seeing the "Brad Pitt" issue of the magazine (assuming, *arguendo*, that it displays "FW forward >>" in a form and manner such that any relevant

portion of the public would perceive it as a combination and a trademark); (B) the evidence makes clear that the great majority of the "Bring on the Sun" events occurred before copies of the "Brad Pitt" issue could have been available at those events, meaning that no "sign-ups" obtained at those events could have been induced by the display or offer of a magazine bearing the alleged mark; (C) the evidence fails to show that any person actually has received the "Brad Pitt" issue of the magazine pursuant to a subscription; (D) the evidence reveals that there has been no newsstand circulation of the "Brad Pitt" issue; (E) the evidence fails to reveal the numbers and locations of persons, if any, who actually have paid to obtain the "Brad Pitt" issue; (F) the evidence fails to reveal how much revenue, if any, and from what locales, if any, FW has obtained from distribution of the "Brad Pitt" issue.

10. Significantly, FW has failed to offer any proof of its market share, if any, nor any proof of the size of the *potential* market for FW's magazine. There is no basis on which the court could conclude that FW's market penetration was legally sufficient to establish common law trademark rights in any territory.

11. If a mark in association with goods or services has received such long and widespread exposure through nationwide advertising and promotion as to result in a "national reputation" even in areas where there have been no sales, such may in certain cases be a basis for finding that a common law mark has achieved nationwide scope. *See Glow Industries*, 252 F. Supp. at 983-84 [citations omitted]. But here the evidence is legally insufficient to demonstrate that FW's advertising and promotion have been of that character, either in terms of length, intensity or duration. On the contrary, FW offered evidence of only limited, localized exposure of its "Brad Pitt" magazine cover. FW has failed, as a matter of law, to establish common law trademark rights of nationwide scope.

12. A plaintiff who has proved neither actual sales penetration in a territory nor reputation extending to that territory might nevertheless prove common law trademark rights in that territory if the evidence establishes that he has a "zone of natural expansion" that includes that territory. The court finds that there is legally insufficient evidence on which to find that FW has established a "zone of natural expansion" such that trademark rights could exist in such zone. *See Glow Industries*, *supra*, 252 F. Supp. at 984.

13. Based on the foregoing, the court concludes that FW's evidence is legally insufficient to establish common law trademark rights in any territory, on any theory.

14. The rule that "when the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived" (*E. & J. Gallo Winery v Gallo Cattle Co.*, 967 F.2d 1280, 1293 (9th Cir. 1992) is inapposite here for at least two reasons. First, "moving forward," in the context of its actual use, is not sufficiently similar to either of FW's alleged marks to support application of the rule. Secondly, the evidence fails to meet the "knowing adoption" prong of the rule. On the contrary, the clear preponderance of the evidence supports the conclusions that TMS adopted "forward"-themed automotive advertising and promotional slogans before it ever encountered FW or its alleged "FW forward >>" and "FW▸▸forward" marks; that TMS selected and began using its "The Power To Move Forward" advertising slogan in association with the Prius brand automobile before the date of first contact between TMS and FW; that TMS's consideration of "moving forward" as a candidate for a new advertising theme or slogan commenced before any adoption by FW of any "FW forward >>" or "FW▸▸forward" mark; and that TMS's selection of "moving forward" was uninfluenced by, and independent of, any selection by FW of any "FW forward >>" or "FW▸▸forward" mark. Hence, the evidence legally insufficient to justify the *Gallo* presumption.

15. Common-law-trademark-type unfair competition under Lanham Act §43(a) (15 U.S.C. §1125(a)) requires a showing that the defendant is using a mark "confusingly similar" to a valid, protectable trademark owned by plaintiff. *Glow Industries*, *supra*, 252 F. Supp. at 975.

16. Likelihood of confusion is assessed not by comparing the subject marks in a vacuum, but by comparing them as they are actually used in the marketplace. *Alpha Indus., Inc. v. Alpha Steel Tube & Shape, Inc.*, 616 F.2d 440, 444 (9th Cir. 1980) (quoting *Walt Disney Prods. v. Air Pirates*, 581 F.2d 751, 759 (9th Cir. 1978)).

17. A determination of likelihood of confusion is based on the so-called "*Sleekcraft*" factors: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of

expansion of the product lines. *Playboy Enters., Inc. v. Netscape Communications Corp.*, 354 F.3d 1020, 1026 (9th Cir. 2004).

18. Inasmuch as FW has failed to identify the precise nature of their marks and such marks appear in at least two iterations, the court concludes that the conceptual strength of the alleged marks is moderate at best.

19. As for "commercial strength," FW claims to have been using "FW▸▸forward" on its website only since April 2004 and has used "FW forward >>" on one magazine cover -- the "Brad Pitt" cover -- that became available only in mid-July 2004. Any commercial exposure of the alleged marks has been quite limited in both temporal duration and volume, and the court finds that the marks' commercial strength at this time is low.

20. The Court concludes that the parties' goods are not proximate, and this lack of proximity militates against a likelihood of confusion.

21. TMS's "moving forward" mark, as actually used in commerce, is not closely similar to FW's alleged marks. The marks are quite dissimilar in sight, sound and meaning, which militates against a likelihood of confusion.

22. As for the "actual confusion" *Sleekcraft* factor, FW has produced not a single example of a consumer who is confused into believing either (1) that FW still endorses Toyota cars or (2) that FW itself is owned or controlled by TMS.

23. There is little or no ongoing, likely-to-continue overlap in marketing channels. While both parties promote their products through websites, they do not have similar names (www.toyota.com versus www.myfw.com) nor offer similar competing services, such as a search engine. FW has offered no evidence that it advertises its services in the print and television media where TMS' advertisements are featured. The channels-of-trade factor militates against a finding of likelihood of confusion.

24. An automobile is a major purchase, and one in which a reasonably prudent purchaser would invest a great deal of care and attention, rendering confusion less likely; but FW asserts that consumers are not careful about who endorses products. For this proposition FW cites not evidence but a judicial decision, *White v. Samsung Elec. Am. Inc.*, 971 F.2d 1395,

1399-1400 (9th Cir. 1992). The court finds this "celebrity-endorsement-misappropriation" case inapposite. Here the product being sold is not a VCR but a Toyota automobile, and what the consumer sees is the not a celebrity look-alike endorsing the product; instead the consumer sees merely the "moving forward" slogan, applied to a very expensive item. The "degree-of-care" factor cuts against likelihood of confusion.

25. As for TMS' intent in adopting the "moving forward" tag-line, the great preponderance of the evidence, reflected in findings above, is that it was adopted in good faith and independently of any use by FW of any mark containing the word "forward," and that TMS was in fact using "forward"-themed automotive advertising slogans before TMS had ever been contacted by FW. An inference of intent to deceive is not warranted and the lack of any wrongful intent weighs against a finding of likely confusion.

26. FW has not proved a likelihood of expansion.

27. FW's "forward confusion" theory is that if TMS is permitted to keep using its "moving forward" tag-line in advertisements for Toyota cars, then the public will be confused into believing that Toyota cars are endorsed or sponsored by FW. The court concludes that FW is not likely to succeed in proving a likelihood of confusion on this theory.

28. In a "reverse confusion" case, the issue is whether consumers doing business with the senior user might mistakenly believe they are dealing with the junior user. *Dreamwerks Prod. Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1129-30 (9th Cir. 1998). FW's proffered "confusion" evidence is weak and does not include a single example of a consumer who purports to be confused, based on seeing the "moving forward" slogan, into believing that Toyota is the source or sponsor of FW's magazine, website or event-promotional services. The court concludes that FW has not made a sufficient showing of likelihood of confusion on its "reverse confusion" theory.

29. FW has made no legally sufficient showing of irreparable harm that would flow from TMS's continued use of the "moving forward" tag-line for its automotive advertisements.

30. FW has not offered any competent evidence that it will suffer any harm as a result of TMS' use of its "moving forward" tag-line. Although the central premise of FW's irreparable harm theory is that TMS' use of "moving forward" will cause it to lose the business of Ford, TMS presents

no Ford witness to attest to that fact, and in view of FW's admissions that "Ford expressed considerable concern" when FW first began pursuing Toyota (Bogo Decl. ¶ 21, Gorman Decl. ¶ 27), there are other reasons, apart from this trademark dispute, why Ford might be disinclined to buy vehicle promotional services from FW. FW has not proven that it will suffer irreparable harm if a preliminary injunction is not granted.

31. The balance of hardships tilts strongly in TMS' favor.

32. Based on the totality of the evidence and upon the applicable law, the court concludes that preliminary injunctive relief is not appropriate in this case.

Any matter herein listed as a finding of fact that is instead correctly classified as a conclusion of law is hereby deemed to be such, and *vice versa.*

Dated: December 8, 2004

George P. Schiavelli, Judge
United States District Court